IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL WATKINS, | ) | |
| | ) | |
| Plaintiff, | ) | 14-cv-8422 |
| | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| LEARN IT SYSTEMS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael Watkins claims that his former employer, Defendant Learn It Systems ("LIS"), terminated his employment because of his race in violation of Title VII of the Civil Rights Act of 1964. LIS has moved for summary judgment [32]. For the reasons given below, the Court grants the motion.

## Factual Background

LIS is a company that provides educational services to low-income children and children with special needs. *See* Def.'s SOF ¶ 1, ECF No. 33. During the 2012–2013 school year, LIS contracted with schools in Illinois to provide Supplemental Education Services, a tutoring program, to qualifying students. *See id.* ¶¶ 7–8. LIS employed two Supplemental Education Services teams in Illinois. *See id.* ¶ 12. Each team was led by an Area Manager and staffed by two Program Managers. *See id.*

Watkins, an African-American man, applied for a Program Manager position with LIS in early August of 2012. *See* Am. Compl. ¶ 1; Def.'s SOF ¶ 4. Program Managers' responsibilities included delivering tablets and Wi-Fi cards to students, monitoring each student's progress, communicating with parents and students

about uncompleted lessons, retrieving tablets, and providing technical support. *See id.* ¶¶ 25–28. Some of these obligations required visiting students' homes. *See id.*

After Watkins applied, one of the two Illinois Area Managers, Trisha Irvin, an African-American woman, interviewed him and emailed her supervisor in Miami, Christian Ruiz, to express her strong approval of Watkins for the position. *See* Def.'s SOF ¶¶ 4, 13, 18, 59. Irvin then hired Watkins for her team, and his employment began August 28, 2012. *See* Def.'s SOF ¶¶ 4, 13. Irvin also hired another African-American man, Kendall Berry, to fill the second Program Manager position on her team. *Id.* ¶ 13.

The other Illinois team was led by Area Manager Marlon Orozco, a Hispanic man. *Id.* ¶ 14. His two Program Managers were Ruby Magdaleno, a Hispanic woman, and Aaron Jenkins, an African-American man. *Id.*

The two Area Managers, Irvin and Orozco, decided between them which districts their teams would service. *Id.* ¶ 21. Irvin selected the City of East St. Louis and some Southside schools in the Chicago Public Schools ("CPS") system. *See id.* ¶¶ 9, 22–23. Orozco selected other Southside CPS schools as well as schools on the Westside of Chicago and in the Chicago suburbs. Pl.'s Resp. Def.'s SOF ¶ 57.

LIS's contracts with CPS and East St. Louis required services to be provided to students outside of school hours. *See* Def.'s SOF ¶¶ 10–11. In his deposition for this case, Watkins testified that working evening hours in the neighborhoods he serviced was dangerous because of high rates of crime. *See id.* ¶ 33, 48, 56, 58–65. He also testified that Orozco's team did not have to work late hours in dangerous

2

areas like East St. Louis. *See id.* ¶¶ 6, 48, 57–58, 60–61; Pl.'s SOAF ¶¶ 26, 28–31. He did not know what kind of hours Orozco's team worked, but he believed that none of the areas that team serviced were as crime-ridden as East St. Louis. *See* Pl.'s Ex. 1, Watkins Dep. at 215–18. That said, Watkins has not identified any objective evidence that the areas he serviced were more dangerous than the areas Orozco's team serviced, although he testified that he did report his safety fears to Irvin. Pl.'s SOAF ¶ 27; Pl.'s Ex. 1, Watkins Dep. at 52, 209. In response, Irvin relayed to him that her boss, Ruiz, had said, "Hey, I don't care. Dangerous or not, get it done. Do it." Pl.'s Ex. 1, Watkins Dep. at 210; *see also* Def.'s SOF ¶¶ 59–60.

During the first two months of Watkins's employment with LIS, Irvin twice thanked him via email for his contributions to the team. *See* Pl.'s SOAF ¶ 22; Pl.'s Ex. 6, 10/26/12 Email of Irvin to Watkins; Pl.'s Ex. 7, 9/29/12 Email of Irvin to Watkins. By November, however, Irvin had begun sending emails to Watkins describing problems with his performance and asking him to make improvements.[1] *See* Def.'s SOF ¶¶ 36–39; Def.'s Ex. 11, 11/3/12 Email of Irvin to Watkins; Def.'s Ex. 12, 1/22/13 Email of Irvin to Watkins; Def.'s Ex. 13, 2/13/13 Email of Irvin to Watkins; Def.'s Ex. 14, 2/13/13 Email of Irvin to Watkins.

In late February 2013, about six months after Watkins was hired, Irvin presented him with a Corrective Action Plan. *See* Def.'s SOF ¶ 16; Def.'s Ex. 15, Corrective Action Plan. Chequita Whitaker, the Operations Manager for LIS's

---

[1] Watkins challenges the unfavorable emails as hearsay. Pl.'s SOAF ¶ 36. His argument is addressed in the analysis below.

3

Illinois office, attended the meeting during which the plan was presented to Watkins. *See* Def.'s SOF ¶ 16; Def.'s Ex. 15, Corrective Action Plan.

Irvin asked Watkins to sign the plan, but he refused. *See* Def.'s SOF ¶¶ 40–41; Def.'s Ex. 15, Corrective Action Plan; Pl.'s SOAF ¶¶ 23–24. According to Whitaker, Watkins also called the plan "bullshit" and crumpled it up. Def.'s Ex. 9, Whitaker Dep. at 52. Watkins denies the profanity and the crumpling, but he admits that he refused to sign. Pl.'s Resp. Def.'s SOF ¶¶ 42–43.

Following the meeting, Irvin sent an email to LIS's Human Resources Manager, Erica Rivas, informing her that Watkins had refused to sign the Corrective Action Plan. Def.'s SOF ¶ 43; Def.'s Ex. 16, 2/25/13 Email of Irvin to Rivas. In an affidavit, Rivas recounts that, "after Ms. Irvin reported that Mr. Watkins had refused to sign his Corrective Action Plan," Irvin "decided to terminate him and recommended termination to me, as HR manager." Def.'s Ex. 10, Rivas Aff. ¶¶ 2–3. Whitaker similarly attests that Irvin said she "wanted [Watkins] gone" because "she just felt he wasn't pulling his weight." Def.'s Ex. 9, Whitaker Dep. at 34–35.

A few days after Watkins's refusal to sign the Corrective Action Plan, LIS terminated his employment. *See* Def.'s SOF ¶¶ 35, 44. The termination took place during a meeting attended by Irvin and Orozco, with Ruiz and Rivas participating by phone. *See* Def.'s SOF ¶ 44; Pl.'s Ex. 1, Watkins Dep. at 206. Watkins testified that Irvin and Rivas were the ones who "did the talking," explaining to him simply,

4

"'We feel that we're not gonna need your services any longer.'" Pl.'s Ex. 1, Watkins Dep. at 206.

Sometime after Watkins was fired, both Irvin and Ruiz were fired as well. Def.'s SOAF ¶¶ 2–3. Neither of them was deposed for this case.

## Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party "must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

Watkins claims that LIS discharged him because of his race in violation of Title VII of the Civil Rights Act of 1964. Am. Compl. ¶¶ 7–8. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation,

5

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Although Watkins hints at a retaliation claim in some of his filings, *see, e.g.*, Pl.'s SOAF ¶ 32,[2] his amended complaint unambiguously includes only a wrongful-termination claim, *see generally* Am. Compl, ECF No. 2. Because a plaintiff's response to a motion for summary judgment cannot add claims to his complaint, *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996), the Court will consider only Watkins's wrongful-termination claim.

LIS has moved for summary judgment on Watkins's claim, contending that he has not presented evidence from which a reasonable jury could find for him. Watkins responds to LIS's motion by arguing that he has satisfied the burden-shifting method for defeating a motion for summary judgment that was first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). He also argues that LIS's motion for summary judgment should be denied because, in his view, he has presented direct and circumstantial evidence from which a reasonable jury could conclude that LIS fired him because of his race. This latter method is the standard way to defeat a motion for summary judgment, as was recently reiterated by the Seventh Circuit in *Ortiz v. Werner Enterprises, Inc.*, No. 15-2574, 2016 WL 4411434, at *5 (7th Cir. Aug. 19, 2016). As explained below, the Court concludes that neither of Watkins's arguments has merit.

---

[2] In his statement of additional facts, Watkins asserts that he was terminated "because he complained to Trisha Irvin that he was being treated differently than similarly situated non-African-American employees." Pl.'s SOAF ¶ 32.

6

### A. *McDonnell Douglas* Method

In *McDonnell Douglas Corp. v. Green*, the Supreme Court laid out one method by which a plaintiff in an employment-discrimination case can defeat a defendant's motion for summary judgment. The plaintiff must first present evidence satisfying the elements of a *prima facie* case, which are that (1) he is a member of a protected class; (2) he was satisfying his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside his protected class were treated more favorably. *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009). Under certain circumstances, the "legitimate expectations" and "similarly situated" inquiries will collapse into one another. *See Orton-Bell v. Ind.*, 759 F.3d 768, 777 (7th Cir. 2014) ("Where an employee who failed to meet expectations claims that she has been treated differently from a male employee who similarly failed to meet expectations, the second element merges into the fourth.")

If the plaintiff makes this *prima facie* showing, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454 (7th Cir. 1999). If the defendant articulates such a reason, the burden then shifts back to the plaintiff to show that the stated reason is a pretext. *See id.* A pretext is defined as "a lie, specifically a phony reason for some action." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999).

Watkins contends that he has made out a *prima facie* case under *McDonnell Douglas*. Resp. Br. at 6–13. As to the first and third requirements, Watkins is

indisputably a member of a protected class, and he suffered a classic adverse employment action when he was fired. A thornier question is whether he met his employer's legitimate expectations, the second requirement under *McDonnell Douglas*. Watkins contends that he did, *see* Def.'s SOAF ¶¶ 12–18, and although there is substantial evidence that Irvin disagreed, no one was deposed for this case who could speak directly to Watkins's actual performance. This question, however, need not be resolved because, as explained below, Watkins has failed to identify a similarly situated comparator to satisfy the fourth element of a *prima facie* case.

Factors courts consider to determine whether employees are similarly situated include whether they "(i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications." *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005). To serve as a comparator, a similarly situated employee must be someone from outside the plaintiff's protected class who was treated more favorably than the plaintiff in that the employee did not suffer the adverse action forming the basis for the plaintiff's claim. *See Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) (explaining that a comparator helps isolate discriminatory animus behind an adverse action because, "if an employer takes an [adverse] action against one employee in a protected class but not another outside that class, one can infer discrimination"), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, No. 15-2574, 2016 WL 4411434 (7th Cir. Aug. 19, 2016).

The only potential comparators Watkins identifies are the Program Managers on Orozco's team. One of those Program Managers, Aaron Jenkins, was African-American, meaning that he was within Watkins' protected class, and so cannot serve as a comparator. That leaves Ruby Magdaleno, who was Hispanic. But Watkins has presented no evidence that Magdaleno was treated more favorably than he was. Watkins does point out that he was sent to East St. Louis, while Orozco's team was not. But, even if Watkins could point to facts demonstrating that being assigned to East St. Louis constituted an adverse employment action (which he does not do), it is Watkins' discharge, not his area assignment, that forms the basis of his Title VII claim. *See* Amended Compl. ¶ 7-10 (alleging that Watkins was discharged in violation of Title VII). As such, the question relevant under *McDonnell Douglas* is whether Magdaleno was retained, rather than fired, even though she performed similarly to Watkins. Watkins, however, does not explain whether Magdaleno was discharged or whether she performed similarly to him. Magdeleno thus cannot serve as a similarly situated comparator, and without a comparator, Watkins cannot proceed under *McDonnell Douglas*.

### B. Standard Method

A plaintiff who cannot meet the requirements of *McDonnell Douglas* may nevertheless defeat a motion for summary judgment. *See Ortiz*, 2016 WL 4411434, at *3. The plaintiff need only show that a reasonable jury could find from admissible evidence that his employer would not have taken the adverse employment action but for the plaintiff's membership in a protected class. *Id.*

Watkins argues that he has presented direct and circumstantial evidence from which a reasonable jury could conclude that he was fired because of his race. *See* Resp. Br. at 5. Such evidence "must relate to the motivation of the decisionmaker responsible for the contested decision." *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 203 (7th Cir. 1996); *see also Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011) (Title VII plaintiffs must present evidence "that the decisionmaker has acted for the prohibited reason").

The evidence that Watkins primarily relies upon is, once again, his testimony that Irvin's team, which was made up exclusively of African Americans, was pressured by Ruiz to work late hours in East St. Louis and other "dangerous areas." Resp. Br. at 5. Watkins also contends that Ruiz played some role in his firing, pointing to the Corrective Action Plan, which came from Irvin and Ruiz jointly. *See* Def.'s Ex. 15, Corrective Action Plan. In addition, Watkins points to an email written by Rivas, the Human Resources Manager, in which she says she is "onboard with letting Michael [Watkins] go today" after speaking with Ruiz about Watkins's failure to meet certain goals. *See* Pl.'s Ex. 3, 2/26/13 Email from Rivas to Whiting & Hannan. Watkins's argument, though he does not clearly spell it out, seems to be that Ruiz's insistence that Irvin's team work in dangerous areas establishes that Ruiz harbored racists beliefs against African Americans, which might permit an inference that Ruiz caused Watkins to be fired because he too was African American.

The Court concludes, however, that a reasonable jury could not find from the evidence in the record that Watkins was fired because of his race. First, Watkins himself testified in his deposition that, in his view, his firing was *not* racially motivated. He was asked directly, "Do you contend that the actual termination of your employment, the February 26th termination, that that was the product of racism as well?" He answered, "To me, that has nothing to do with East St. Louis, and putting me—my life in danger." Pl.'s Ex. 1, Watkins Dep. at 229. Asked to confirm that his answer was "no," he agreed. *Id.* Similarly, Watkins testified at another point in his deposition that the only race discrimination he suffered was being sent to work in dangerous areas:

> Q. [O]ther than the testimony you've already given about East St. Louis and making deliveries also in Chicago, there's no other act of discrimination that's the basis for your complaint?
>
> A. Correct. That's good enough.

*Id.* at 63. Yet Watkins's amended complaint unambiguously includes only a single claim that he was fired because of his race. *See generally* Am. Compl.

Second, the admissible evidence in the record establishes that Irvin was the person who pushed for Watkins to be fired and that she did so because of her perception that he was performing poorly. Watkins's own statement of facts calls Irvin the "person who was the ultimate decision maker who fired Michael Watkins." Pl.'s SOAF ¶ 1. And Irvin's belief that Watkins was performing his job poorly is well documented. She repeatedly criticized his work performance in emails to him and, according to Whitaker,

in conversation with her. *See* Def.'s SOF ¶¶ 36–38; Def.'s Ex. 11, 11/3/12 Email of Irvin to Watkins; Def.'s Ex. 12, 1/22/13 Email of Irvin to Watkins; Def.'s Ex. 13, 2/13/13 Email of Irvin to Watkins; Def.'s Ex. 14, 2/13/13 Email of Irvin to Watkins; Def.'s Ex. 9, Whitaker Dep. at 34–35. Irvin also emailed Rivas to complain about Watkins's negative reaction to the Corrective Action Plan. Def.'s SOF ¶ 43; Def.'s Ex. 16, 2/25/13 Email of Irvin to Rivas.

Watkins concedes that the emails in the record were sent by Irvin, but he seeks to exclude them as hearsay. Def.'s Resp. Pl.'s SOF ¶¶ 36–38; Resp. Br. at 4–5. Presumably he would have the same objection to Rivas and Whitaker's testimony about what Irvin said to them about him.

Hearsay statements cannot be used to support a motion for summary judgment any more than they can be used at trial. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). To constitute hearsay, however, statements must be offered for the truth of the matter asserted. Fed. R. Evid. 801(c)(2). In this case, that means Irvin's statements are hearsay only if they are offered as evidence that Watkins actually performed his job poorly. But they are not; they are offered as evidence of Irvin's view of Watkins's job performance. Irvin's statements thus are not hearsay. *See E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 333 (7th Cir. 2002) (employee's statement that "it looked like she was going to get fired" not hearsay because offered to show her state of mind rather than for statement's truth); *Komal v. Arthur J. Gallagher & Co.*, 833 F. Supp. 2d 855, 860 (N.D. Ill. 2011) (documents

referring to plaintiff's "inadequate job performance" were admissible to show that supervisors claimed the performance was inadequate rather than to show that plaintiff "actually was performing inadequately.").

It is possible, of course, that Irvin did not truly believe that Watkins was performing poorly but said so to hide her racist beliefs or those of Ruiz. To support such a proposition, Watkins stresses that Irvin had also praised him during his time at LIS. *See* Resp. Br. at 10. He believes that she only sent the critical emails "to cover herself," and "in case she ever received pressure from upper management," meaning Ruiz. Pl.'s Ex. 1, Watkins Dep. at 174, 236–37. He does not offer an explanation for the Corrective Action Plan.

The problem with Watkins's reliance on Irvin's positive comments to call into question the sincerity of her criticisms is that the praise came in September and October of 2012, while the pertinent question in a Title VII case is the employer's assessment of the employee's performance at the time of discharge, here February 2013. *See Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002). In fact, Irvin began criticizing Watkins as early as November 2012, when she first emailed him with concerns about his job performance, and the criticism continued through the time of his termination.

Watkins's argument that Irvin's criticisms were only a cover up for racially biased intentions fairs no better. His description of Irvin's supposed true motive, aside from being vague, is entirely speculative, and, without

13

more, a plaintiff cannot defeat a motion for summary judgment in a Title VII case by "speculating as to an employer's state of mind." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014).

In short, Watkins has not presented evidence from which a reasonable jury could conclude that Irvin chose to terminate his employment because of his race. She attributed her decision to Watkins's job performance, and even assuming that her assessment of his performance was unfair, Watkins himself testified that he did not believe racism motivated Irvin to send him the critical emails that preceded his termination. Pl.'s Resp. Def.'s SOF ¶ 53; Pl.'s Ex. 1, Watkins Dep. at 192.[3] And, even if Irvin's statements about Watkins's job performance were inadmissible, the fact would remain that the record is devoid of evidence from which a reasonable jury could infer that Irvin fired Watkins because of his race.

Nor could a reasonable jury find that Ruiz caused Watkins to be fired and that he did so because of Watkins's race. The chain of inferences required

---

[3] The following exchange took place during Watkins's deposition:

> Q. The e-mails we've discussed so far where Ms. Irvin in November of 2012 and then in February, for example, of 2013, et cetera, in sending these e-mails that she had some sort of racist intent? Ms. Irvin? Or that she was a racist in any way?
>
> A. I could not, would not say that, no. · That wouldn't be –
>
> Q. Okay.
>
> A. Not true.

Pl.'s Ex. 1, Watkins Dep. at 192.

14

to reach that conclusion fails at each step. Watkins's evidence that Ruiz was racist against African Americans is confined to Ruiz's purported lack of concern for the safety of Irvin's team. But there is no evidence that Ruiz had any greater concern for Orozco's team, and the fact that Irvin's team worked in the particular areas in which it worked is undisputedly the result of *Irvin's* decision to serve those particular areas. Def.'s SOF ¶¶ 21–22; Pl.'s Resp. Def.'s SOF ¶¶ 21–22. And even if Ruiz did have less concern for the safety of Irvin's team, which was made up of two African-American Program Managers, than he had for Orozco's team, which was made up of one Hispanic and one African-American Program Manager, it is not clear why that would cause him to fire Watkins. Additionally, there is no evidence from which a reasonable jury could infer that Ruiz, rather than Irvin, was the driving force behind Watkins's firing. It is small wonder then that Watkins himself testified in his deposition that he did not believe racism played any role in his firing. *See* Pl.'s Ex. 1, Watkins Dep. at 63, 229.

LIS may well have failed to show proper concern for the safety of its employees, but Title VII was not designed to remedy unsafe working conditions. Without direct or circumstantial evidence that Irvin, Ruiz, or anyone else at LIS caused Watkins's to be fired because of his race, no reasonable jury could find in Watkins's favor on his claim. As a result, LIS's motion for summary judgment must be granted.

## **Conclusion**

For the reasons stated herein, LIS's motion for summary judgment [32] is granted.

**IT IS SO ORDERED.**     **ENTERED     9/20/16**

*/s/ John Z. Lee*

_____
**John Z. Lee
United States District Judge**